**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Richard Arthur Wilson</u>

     **v.**                          Civil No. 13-cv-285-PB
                                        Opinion No. 2014 DNH 100
<u>Carolyn W. Colvin,</u>
<u>Acting Commissioner,</u>
<u>Social Security Administration</u>

<u>**MEMORANDUM AND ORDER**</u>

Richard Arthur Wilson seeks judicial review of a ruling by the Commissioner of the Social Security Administration ("SSA") denying his application for Disability Insurance Benefits ("DIB").  Wilson claims that the Administrative Law Judge ("ALJ") erred in failing to call a medical advisor to assist him in determining the onset date of his claimed disability.

For the reasons set forth below, I vacate the decision of the Commissioner and remand for further administrative proceedings.

**I.   <u>BACKGROUND</u>**[1]

**A.   <u>Procedural History</u>**

Wilson applied for DIB on May 14, 2010,[2] claiming that he became disabled on July 1, 1994 due to depression, post-

---

[1] The background facts are presented in the parties' Joint Statement of Material Facts (Doc. No. 15) and are summarized here.  I also rely on the Administrative Transcript (Doc. No. 7), citations to which are indicated by "Tr.".

traumatic stress disorder (PTSD), social anxiety disorder, obsessive compulsive disorder (OCD), and generalized anxiety disorder.[3]  Tr. at 28.  He was fifty-six years old at the time of his application.  The SSA determined that Wilson's DLI was December 31, 1999.  After reviewing his application, it denied his DIB claim on September 23, 2010.  Id.  Wilson requested a hearing before an ALJ, which was held on December 13, 2011.  He appeared by video and was represented by an attorney.  Tr. at 23.  On December 23, 2011, the ALJ issued a decision finding that Wilson had not been disabled prior to his DLI.  The Appeals Council denied Wilson's request for review on April 4, 2013.  Accordingly, the ALJ's decision is the final decision of the Commissioner.

**B.   Relevant Medical History**

  1.  October 2005 – October 2009

     Wilson's medical record includes notes from seven hospital visits prior to his first report of a mental impairment.  On October 26, 2005, Wilson visited the emergency room at Dartmouth Hitchcock Medical Center complaining of right shoulder pain

---

[2] Wilson previously applied and was rejected for Supplemental Security Income ("SSI") because his assets exceeded the relevant threshold for those benefits.  Tr. at 29.

[3] Wilson initially alleged that he became disabled on July 1, 1993, but subsequently amended the alleged disability onset date to July 1, 1994.

after a fall.  Tr. at 291.  He was diagnosed with a right mid-shaft clavicle fracture and a right ankle sprain.  Treatment notes from this visit and four follow-up appointments report that Wilson appeared healthy apart from his injuries and was alert, cooperative, ambulatory, neurologically intact, and in no acute distress.

Wilson next sought medical care three years later.  On October 13, 2008, he visited his primary care physician, Dr. Ellen Eisenberg, M.D., complaining of various chronic and acute medical problems.  He stated that his last physical exam had occurred when he was in the service.[4]  Tr. at 275.  Wilson subsequently visited Physician Assistant James Gosselin on October 15, 2009 with complaints of chronic low back pain.  Dr. Eisenberg's and Mr. Gosselin's notes from these visits indicate that Wilson was healthy and presented with a stable mood, no depression, and no psychological symptoms.

2.  November 2009 – June 2011

After Wilson first reported psychological difficulties to his medical providers in November 2009, multiple sources documented opinions regarding his impairments.  These sources

_____

[4] Wilson reported to the SSA that he had worked as a civilian electrician from 1976 to 1994.  Tr. at 130.  His record also reports a history of earnings between 1967 and 1975.  Tr. at 81. Assuming that the "service" to which Wilson refers is military in nature, it presumably occurred prior to 1976.

include James Gosselin; psychiatrists Christine Finn, M.D., and
Douglas Noordsy, M.D.; and psychologists Claudia Zayfert, Ph.D.,
Leslie Bryant, Ph.D, and Michael Schneider, Psy.D.  Wilson also
provided evidence of his own functional limitations.

### a.  Physician Assistant Gosselin

On November 30, 2009, Wilson reported to Mr. Gosselin that
he experienced difficulty being around people and had struggled
with anxiety all of his life.  He recounted that it had become
such a problem that he eventually quit his job in 1994.  Wilson
stated that he had recently grown sadder, felt worthless, had
lost interest in activities that he previously enjoyed, and had
racing thoughts that he dealt with by falling asleep on his
couch to old sitcoms.  After noting that Wilson was alert and
oriented with respect to place, time, and other people, Mr.
Gosselin diagnosed Wilson with depression and anxiety,
prescribed Lexapro,[5] and referred Wilson to Dr. Finn.  Tr. at
265.

Wilson returned to Mr. Gosselin on at least three occasions
over the next fourteen months.  During these visits, he noted
that he was able to walk his dog, split firewood, and take care
of his granddaughter three days a week.  On one occasion, Mr.

---

[5] Lexapro is an antidepressant.  Dorland's Illustrated Medical
Dictionary 654, 1047 (31st ed. 2007).

Gosselin noted that Wilson was a "healthy male with stable depression and anxiety."  On at least one occasion, Wilson showed no symptoms of depression and was not in acute distress. Mr. Gosselin noted Wilson's history of anxiety and depression, but was unable to determine a particular onset date for his impairments.

On June 27, 2011, Mr. Gosselin and Dr. Eisenberg together opined that Wilson was markedly limited in his ability to respond appropriately to usual work situations and to changes in a routine work setting, as well as in his ability to interact appropriately with the public, with supervisors, and with coworkers.  As an example, they noted that Wilson required medication before leaving his house and had difficulty going out to pick up a pizza.

### b.  Dr. Finn

Dr. Finn examined Wilson on two occasions in January 2010. During these visits, Wilson complained of lifelong anxiety and difficulty managing social situations.  He reported that he feared embarrassing himself and drawing attention to himself, had thoughts that everyone was looking at him, had difficulty being in crowds, had a tendency to rethink things he had said, had anxious ruminations that interfered with his sleep, suffered from headaches and sweaty palms, and checked to see that his

garage door was closed up to twenty times a day.  Wilson stated
that he was experiencing increasing anxiety due to an upcoming
court appearance and the prospect of participating in a social
anxiety group.  At his first appointment, he noted that Lexapro
took the edge off his depression, but residual symptoms
remained.  At the next appointment, Wilson denied any symptoms
of depression and reported an improvement in his mood.

Dr. Finn observed that Wilson was stressed with an anxious
mood and affect.  She noted that he was alert and oriented, with
good judgment, good insight, a linear and goal-directed thought
process, an appropriate fund of knowledge, and intact attention
and memory.  Dr. Finn concluded that Wilson's symptoms were
consistent with dysthymia,[6] but he was "not greatly functionally
impaired by it."  Tr. at 262.  She also opined that Wilson
appeared to have generalized anxiety disorder, social phobia,
specific phobia, and obsessive compulsive disorder (OCD).[7]  She

---

[6] Dysthymia involves a "[d]epressed mood for most of the day, for
more days than not . . . ."  Am. Psychiatric Ass'n, Diagnostic
and Statistical Manual of Mental Disorders 168 (5th ed. 2013)
[hereinafter DSM-V].

[7] Generalized anxiety disorder involves "excessive anxiety and
worry (apprehensive expectation) about a number of events or
activities."  Id. at 222.  Social phobia, also known as social
anxiety disorder, involves "a marked, or intense, fear or
anxiety of social situations in which the individual may be
scrutinized by others."  Id. at 203.  Specific phobia involves
"[m]arked fear or anxiety about a specific object or situation .

assigned Wilson a Global Assessment of Functioning ("GAF") score
of sixty.[8]  Dr. Finn then referred Wilson to Drs. Noordsy and
Zayfert for further treatment.  Tr. at 251, 257.

### c.  Dr. Noordsy

Wilson visited Dr. Noordsy monthly between January and June
2010 and quarterly for the remainder of the year.  He informed

---

. . ."  Id. at 197.  Obsessive compulsive disorder involves
either "[r]ecurrent and persistent thoughts, urges, or images
that are experienced . . . as intrusive and unwanted, and that
in most individuals cause marked anxiety and distress," or
"[r]epetitive behaviors . . . or mental acts . . . that the
individual feels driven to perform in response to an obsession
or according to rules that must be applied rigidly," or both.
Id. at 237.

[8] A GAF score of fifty-one to sixty indicates "[m]oderate
symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) OR moderate difficulty in social,
occupational, or school functioning (e.g., few friends,
conflicts with peers or co-workers)."  Am. Psychiatric Ass'n,
Diagnostic and Statistical Manual of Mental Disorders 34 (4th
ed. text rev. 2000).  In contrast, a score of forty-one to fifty
indicates "[s]erious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious
impairment in social, occupational, or school functioning (e.g.,
no friends, unable to keep a job)."  Id.  A score of sixty-one
to seventy indicates "[s]ome mild symptoms (e.g., depressed mood
and mild insomnia) OR some difficulty in social, occupational,
or school functioning (e.g., occasional truancy, or theft within
the household), but generally functioning pretty well, has some
meaningful interpersonal relationships."  Id.  The SSA has
remarked that the GAF Scale "does not have a direct correlation
to the severity requirements in our mental disorders listings,"
Revised Medical Criteria for Evaluating Mental Disorders and
Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21,
2000), and the American Psychiatric Association no longer
recommends its use due to "its conceptual lack of clarity . . .
and questionable psychometrics in routine practice."  DSM-V,
supra note 6, at 16.

Dr. Noordsy that he had been sexually abused by a family priest
at around age ten and had stopped working in 1994 due to
persistent anxiety about returning to work the following day.
Wilson noted that he had always experienced social discomfort,
particularly in situations where he was alone with a man,
because he was afraid that someone would make an advance on him.
Consequently, all of his friends were women.  Wilson reported
that he had experienced worsening depression for several years
in addition to anxiety and nervousness around strangers.
Although his symptoms had improved since he began taking
Lexapro, Wilson nevertheless told Dr. Noordsy that he wished he
could have a "cell to stay in where he can be left alone."
Wilson informed Dr. Noordsy that he was overwhelmed and anxious
when challenged by stressors or changes in routine.  He noted
that he was fine while at home, enjoyed weekly visits with his
parents, and could shop for groceries at IGA or Walmart, but did
not visit other stores because of social discomfort.  He
reported that he did not want to use the buttons on credit card
machines because he felt as if everyone in the room was staring
at him.  Wilson subsequently reported that he only left the
house to visit his therapist.

　　　After several sessions with Dr. Noordsy, Wilson informed
him that he still had symptoms of anxiety which had improved

8

somewhat.  He noted that Lexapro helped him to maintain a
generally good mood, but it did not significantly affect his
anxiety.  Wilson also reported that his OCD symptoms had
improved and that he had learned to let go of compulsions much
more quickly.  He reported that he had stopped participating in
therapy with Dr. Zayfert in March due to her suggestion that he
participate in group therapy and vocational training, which made
him anxious and unable to sleep.  In contrast, medication
combined with psychotherapy with Dr. Bryant had helped ease his
depression.  During one visit in April, Wilson reported that he
had cried the day before, felt more down about losses, and had
suicidal thoughts every day without a plan or intent to act on
them.  In the following months, Wilson reported that he was
having no abnormal or psychotic thoughts.  Thoughts of suicide
returned in September, but without psychotic symptoms.  Wilson
agreed to follow Dr. Noordsy's advice to continue exercising
regularly as a means of managing his anxiety and depression.  He
also told Dr. Noordsy that he was applying for disability
benefits and considering starting his own business.

     Dr. Noordsy noted that Wilson showed substantial
improvement on Lexapro but opined that psychotherapy was likely

to be the most helpful treatment.  He prescribed Buspirone[9] to Wilson in March, increased Wilson's dose of Lexapro in May, and prescribed Clonazepam[10] in June for extreme anxiety before increasing the dosage of that drug in September.  Tr. at 232. Wilson reported that he felt much better as a result of the increased dosage of Lexapro and had not had an "episode" in more than two weeks.

Dr. Noordsy noted on several occasions that Wilson was oriented times four;[11] had a linear, logical, coherent, and goal-directed thought process; normal memory; fair to good judgment, attention, and concentration; intact, logical, and coherent associations; calm or full affect with some tension; an anxious and sad mood that showed occasional improvement; and suicidal thoughts without psychotic symptoms.  He reported that Wilson was preoccupied with public appearances.  Dr. Noordsy diagnosed

---

[9] Buspirone is "an antianxiety agent used in the treatment of anxiety disorders and for short-term relief of anxiety symptoms . . . ."  Dorland's, supra note 5, at 269.

[10] Clonazepam is used "as an antipanic agent in the treatment of panic disorders . . . ."  Id. at 379.

[11] Orientation times four refers to recognition of one's temporal, spatial, personal, and situational environment.  See, e.g., Abad v. Astrue, No. 2:11-CV-00629, 2012 WL 3853098, at *5 (S.D.W. Va. Sept. 5, 2012).

Wilson with social anxiety disorder, major depression,[12] OCD, and possibly a dependent personality disorder.[13]  He assigned Wilson a current GAF score of fifty and determined that his highest GAF score in the past year was seventy,[14] indicating significant fluctuation in Wilson's symptoms over the course of his treatment.  Dr. Noordsy concluded that Wilson had experienced lifelong social anxiety that likely preceded the sexual abuse at age ten.

### d.  Dr. Zayfert

Wilson visited Dr. Zayfert on at least six occasions between January and March of 2010 for evaluation and treatment for depression, social anxiety, and OCD.  He informed Dr. Zayfert that he had been depressed for five years, but the depression had worsened in October 2009 due to family difficulties.  He noted that Lexapro helped mitigate his depressive symptoms.  Wilson reported that he had always been anxious around people, had avoided school, had few friends, feared being the center of attention, experienced anxiety in

---

[12] Major depressive disorder involves "either depressed mood or the loss of interest or pleasure in nearly all activities . . . ."  DSM-V, supra note 6, at 163.

[13] A dependent personality disorder "is a pattern of submissive and clinging behavior related to an excessive need to be taken care of."  Id. at 645.

[14] See supra note 8 for a narrative description of these scores.

daily social situations, and was unable to work due to his
anxiety, which also caused him severe distress.  Wilson further
noted that he checked the locks in his home eight to twenty
times per day, filled in grooves in the dirt created by his
granddaughter's bike, always parked his car in the same place,
and kept his wood pile neat.  He explained that this behavior
did not interfere much with his daily functioning, primarily
because he did very little.  Wilson told Dr. Zayfert that he was
surprised to learn that his wife, whom he relied on for
financial support, had filed for divorce.  He added that his
family had suggested that he apply for disability benefits.
Wilson voiced an interest in volunteering as a means of learning
to cope with being around people.

Dr. Zayfert noted that Wilson was cooperative and fidgety
with rapid speech, alert and attentive concentration, normal
memory, a logical and coherent thought process, good judgment,
fair insight, intact associations, a broad affect, and a
euthymic mood.  She reported that Wilson became less avoidant in
later sessions.  She also noted that he began experiencing
suicidal thoughts.  Dr. Zayfert diagnosed Wilson with social
phobia and major depressive disorder in partial remission.  She
concluded that Wilson's anxiety had been present most of his
life and had contributed to significant impairment in his social

12

and occupational functioning, including leading to his
"retirement" from work.  Dr. Zayfert opined that Wilson suffered
from significant anxiety when he believed that attention was
focused upon him.  She determined that Wilson's current and
highest GAF score in the past year was fifty.  According to Dr.
Zayfert, Wilson was most likely to benefit from group treatment
for social anxiety, though he remained unclear about his
treatment goals and motivation for change.  She specifically
noted that Wilson "voiced minimal motivation to engage in
treatment for social anxiety" and that his major life stressors
impeded his readiness to engage in active treatment.

### e.  Dr. Bryant

Dr. Bryant provided individual psychotherapy to Wilson once
or twice a week between April 2010 and August 2011.  On May 12,
2011, she wrote a letter to Wilson's attorney noting her
impressions of Wilson's impairments and functionality.
According to Dr. Bryant's letter, Wilson first realized he
needed help for mental health issues when his ex-wife
unexpectedly announced that she was seeking a divorce.  Up to
that point, Wilson had "avoided medical or mental health
treatment at all costs" due to his extreme social discomfort at
the thought of being examined by doctors.  Dr. Bryant opined

13

that Wilson suffered from PTSD[15] stemming from sexual abuse,
superimposed on debilitating social anxiety that had preceded
the trauma.  She noted that it was very difficult for Wilson to
leave home and that he required a tranquilizer to go to the
grocery store.  According to Dr. Bryant, Wilson's symptoms were
only marginally improved by medication.  She did not believe
that he was capable of providing for himself.

On June 1, 2011, Dr. Bryant reported that Wilson had
extreme limitations in his ability to interact appropriately
with supervisors and coworkers and to respond appropriately to
usual work situations and changes in a routine work setting,
moderate limitations in his ability to interact with the public,
and no limitations in his ability to understand, remember, and
carry out instructions.  She noted that Wilson rarely left home
due to his severe social anxiety and PTSD.  Dr. Bryant reported
that these limitations were first present in October 1994 and
currently prevented him from becoming employed.

On August 30, 2010, Dr. Bryant diagnosed Wilson with PTSD
and generalized social phobia.  She noted that Wilson was unable

---

[15] PTSD involves "[e]xposure to actual or threatened death,
serious injury, or sexual violence" resulting in certain
characteristic symptoms that create "clinically significant
distress or impairment in social, occupational, or other
important areas of functioning."  DSM-V, supra note 6, at 271-
72.

14

to function in social situations, avoided stress by remaining
isolated at home, and had avoided medical treatment for years
due to his social anxiety and PTSD.  She opined that these
limitations had been present since 1993.

### f.  Dr. Schneider

On September 23, 2010, state agency medical consultant Dr.
Michael Schneider reviewed Wilson's complete medical record and
concluded that it contained no medical evidence from Wilson's
alleged onset date to his DLI.[16]  Noting that Wilson's mental
health treatment began in 2010, Dr. Schneider stated that he was
unable to substantiate the existence of a severe impairment
prior to Wilson's DLI.

### g.  Wilson's Function Reports[17]

In two function reports dated August 16, 2010 and January
13, 2011, Wilson reported that he lived alone on his sixteen-
acre property.  He noted that he frequently walked his dog, rode
his bicycle on a rail trail, did housework and laundry, prepared
frozen dinners, did small chores outside, checked for mail, and

---

[16] Although Wilson alleges that he became disabled on July 1,
1994, see supra note 3, Dr. Schneider limited his assessment to
the period between December 31, 1994 and December 31, 1999.  Tr.
at 172.  The discrepancy is immaterial, as there is no evidence
in the record from the latter half of 1994 that would have
changed Dr. Schneider's conclusions.

[17] These reports include entries written by Wilson along with
several written by his attorney on his behalf.

15

watched television.  He stated that he had a hard time falling asleep, but was able to do so on the sofa in front of the television.  Before his ex-wife left him, she prepared all his meals and did most of the housework.  She continued to help him with chores, appointments, and grocery shopping once a month. Wilson reported that if he had to go to the grocery store alone, he would choose to go at a time when there were few people in the store.  Other than food, he purchased everything he needed on the internet.  The only times that Wilson left his land were to ride on the rail trail, go to therapy, and shop with his ex-wife.

Wilson recounted that despite difficulties, he had been able to be around other people and work in the past.  He used to bicycle with his sons when they were younger, but he is no longer in contact with them.  Wilson also noted that he used to go boating with his ex-wife, but he sold the boat because boating required contact with people.  He stated that he became extremely stressed when he talked to anyone and by the mid-1990s had discontinued all social relationships except for with his ex-wife.  He had no friends and had built his house in the middle of his property so that he would not have to make friends.  He dreaded any upcoming interactions with people and continued to have dreams that provoked anxiety about work.

16

Wilson complained of problems concentrating and getting along with others.  He reported extreme fear when he was around other people, especially if he was the center of attention.  Wilson stated that he avoided men, particularly in confined areas such as cars, because of his fear of being molested.

In a Disability Report dated October 20, 2010, Wilson's attorney stated that Wilson avoided all public interaction, did not go to restaurants or movies, and isolated himself in his home to avoid seeing his neighbors.

## C.   Administrative Hearing – December 13, 2011

At the hearing, Wilson testified that he had been sexually molested as a child and had only realized its impact after beginning psychiatric treatment.  Tr. at 348.  He noted that he did not like being the center of attention and felt extremely uncomfortable around other people, especially men.  He first realized he had anxiety after telling a doctor of the frequent episodes in which he felt extremely nervous and uncomfortable, with chest pain and sweaty hands.

Wilson testified that he stopped working in July 1994 because of anxiety.  Tr. at 342-43.  He had cut back his workweek to four days between 1992 and 1994, but still spent every weekend worrying about returning to work on Monday. Wilson noted that he did not pursue treatment or go to the

17

hospital, even when he was experiencing back pain, because he
was too nervous to see a doctor.  He reported that from 1994 to
1999 he did not go to church or visit relatives.  He did not
attend his son's school events because there were too many
people there.  Instead, Wilson reported that he preferred to
stay at home and use the computer.  He noted that his ex-wife
did all the shopping in the mid to late 1990s.  Later, he
occasionally accompanied her on shopping trips.

Wilson reported that he always felt that his neighbors were
watching him when he was outside of his home.  Consequently, he
purchased sixteen acres of property around 2001 and placed his
mobile home in the middle of the property, 400 feet from his
nearest neighbors, to avoid interacting with them.  Tr. at 345,
359.

Although a VE attended the hearing, the ALJ did not solicit
her testimony.  Tr. at 363.

**D.   The ALJ's Decision**

In her decision dated December 23, 2011, the ALJ first
found that Wilson's DLI was December 31, 1999.  She then
proceeded with the five-step sequential evaluation process set
forth in 20 C.F.R. § 404.1520(a)(4) to determine whether an
individual is disabled.  At step one, the ALJ found that Wilson
had not engaged in substantial gainful activity from July 1,

18

1993[18] through his DLI, December 31, 1999.  At step two, the ALJ
relied on Social Security Ruling (SSR) 88-3 for the proposition
that a claimant bears the burden of proof at step two to prove
the existence of a medically determinable impairment,[19] as well
as SSR 96-4p for the proposition that a claimant's symptoms are
insufficient to establish a medically determinable impairment in
the absence of medical signs or laboratory findings.[20]  The ALJ

---

[18] Wilson's actual alleged disability onset date is July 1, 1994.
See supra note 3.

[19] SSR 88-3 does not exist, but the proposition for which it was
cited is undoubtedly correct.  See, e.g., May v. Soc. Sec.
Admin. Comm'r, 125 F.3d 841 (1st Cir. 1997) (per curiam)
(unpublished table decision) (citing Bowen v. Yuckert, 482 U.S.
137, 146 n.5 (1987)).  Although the claimant bears the burden of
proof at this stage of the sequential evaluation process, the
ALJ may deny a claim at step two "only where 'medical evidence
establishes only a slight abnormality or combination of slight
abnormalities which would have no more than a minimal effect on
an individual's ability to work even if the individual's age,
education or work experience were specifically considered' . . .
[because] the step two severity requirement is intended 'to do
no more than screen out groundless claims.'"  Id. (quoting
Barrientos v. Sec'y of Health & Human Servs., 820 F.2d 1, 2 (1st
Cir. 1987); McDonald v. Sec'y of Health & Human Servs., 795 F.2d
1118, 1124 (1st Cir. 1986); SSR 85-28, 1985 WL 56856, at *3
(Jan. 1, 1985)).

[20] See SSR 96-4P, 1996 WL 374187, at *2 (July 2, 1996).  SSR 96-
4P does not discuss the determination of a claimant's disability
onset date.  The parties debate whether Wilson's providers'
observations of his nervousness and other traits can be properly
classified as signs (which may be used to establish the
existence of a medically determinable impairment) or symptoms
(which, on their own, may not).  See id. at *1 & n.2 (citing 20
C.F.R. §§ 404.1528-.1529, 416.928-.929) ("[S]ymptoms, such as .
. . nervousness, are an individual's own perception or

subsequently determined that there were no medical signs or laboratory findings prior to Wilson's DLI to substantiate the existence of a medically determinable impairment during that period, and consequently found that Wilson had not been disabled between July 1, 1993 and December 31, 1999.

## II. <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I must review the pleadings and the administrative record and enter a judgment affirming, modifying, or reversing the final decision of the Commissioner. My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence in the record. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955

---

description of the impact of his or her . . . impairment(s). . . . However, when any of these manifestations is a[] . . . psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, it represents a medical 'sign' rather than a 'symptom.'"). I need not decide that question because, as discussed below, the ALJ only discussed the providers' opinions as they applied to the insured period and made no findings whatsoever regarding whether there was sufficient evidence to establish a medically determinable impairment at any point after Wilson's DLI.

F.2d 765, 769 (1st Cir. 1991) (per curiam) (citing Rodriguez v.
Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir.
1981)).  It is the role of the ALJ, not the court, to resolve
conflicts in the evidence.  Id.  The ALJ's findings of fact are
accorded deference as long as they are supported by substantial
evidence.  Id.  Substantial evidence to support factual findings
exists "if a reasonable mind, reviewing the evidence in the
record as a whole, could accept it as adequate to support his
conclusion."  Id. (quoting Rodriguez, 647 F.2d at 222).  If the
substantial evidence standard is met, factual findings are
conclusive even if the record "arguably could support a
different conclusion."  Id. at 770 (citing Rodriguez Pagan v.
Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)
(per curiam)).

Findings are not conclusive, however, if they are derived
by "ignoring evidence, misapplying the law, or judging matters
entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st
Cir. 1999) (per curiam) (citing Irlanda Ortiz, 955 F.2d at 769;
Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st
Cir. 1986) (per curiam)).

### III.   ANALYSIS

In the present case, uncontradicted medical evidence supports Wilson's contention that the onset of his claimed disability preceded his DLI.  The issue presented in this appeal is whether the ALJ was entitled to disregard that evidence and determine that Wilson was not disabled prior to his DLI without first consulting a medical advisor pursuant to SSR 83-20, 1983 WL 31249 (Jan. 1, 1983).  Because the ALJ erred in failing to consult a medical advisor, I remand the case for further proceedings consistent with this Memorandum and Order.

**A.   SSR 83-20**

Wilson contends that the ALJ contravened SSR 83-20 by inferring, without the assistance of a medical advisor, that he was not disabled prior to his DLI.[21]  The Ruling notes that for "disabilities of nontraumatic origin,[22] the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity."  SSR 83-20, 1983 WL 31249, at *2.  The "starting point in determining the date of onset of

---

[21] Social Security Rulings are binding on ALJs.  20 C.F.R. § 402.35(b)(1); accord McDonald, 795 F.2d at 1125.

[22] There is no evidence that Wilson was subjected to any trauma after his DLI that might have precipitated his alleged mental impairments.

disability is the individual's statement as to when disability
began," which "should be used if it is consistent with all the
evidence available."  Id. at *2-3.  The date of work stoppage is
also "frequently of great significance in selecting the proper
onset date."  Id. at *2.  These two factors are significant,
however, only to the extent that they are "consistent with the
severity of the condition(s) shown by the medical evidence,"
which "serves as the primary element in the onset
determination."  Id. at *1-2.  An ALJ cannot determine an onset
date in the absence of medical evidence.  Id.  Nonetheless,

> [w]ith slowly progressive impairments,[23] it is
> sometimes impossible to obtain medical evidence
> establishing the precise date an impairment became
> disabling.  Determining the proper onset date is
> particularly difficult, when, for example, the alleged
> onset and the date last worked are far in the past and
> adequate medical records are not available.  In such
> cases, it will be necessary to infer the onset date
> from the medical and other evidence that describe the
> history and symptomatology of the disease process.

Id. at *2.

    In these circumstances, SSR 83-20 specifies at least three
steps that an ALJ may, and in some circumstances must, take to

_____

[23] The impairments alleged by Wilson fall into this category.
See, e.g., Spellman v. Shalala, 1 F.3d 357, 362 (5th Cir. 1993)
(anxiety and depression); Meyer-Williams v. Comm'r of Soc. Sec.,
No. 8:09-CV-1954-T-17MAP, 2011 WL 843964, at *4 n.1 (M.D. Fla.
Feb. 17, 2011) (OCD), rep. & rec. adopted sub nom. Williams v.
Comm'r of Soc. Sec., No. 8:09-CIV-1954-T-17, 2011 WL 843972
(M.D. Fla. Mar. 8, 2011); Magnusson v. Astrue, 2009 DNH 054, 23
(PTSD).

infer an onset date.  First, "[i]f there is information in the
file indicating that additional medical evidence concerning
onset is available, such evidence should be secured before
inferences are made."[24]  Id. at *3.  Second,

> [i]f reasonable inferences about the progression of
> the impairment cannot be made on the basis of the
> evidence in file and additional relevant medical
> evidence is not available, it may be necessary to
> explore other sources of documentation.  Information
> may be obtained [with the claimant's consent] from
> family members, friends, and former employers to
> ascertain why medical evidence is not available for
> the pertinent period and to furnish additional
> evidence regarding the course of the individual's
> condition.[25]

Id.  Third, if an ALJ lacks "a legitimate medical basis" to
identify a particular onset date because the evidence regarding
onset is ambiguous, he or she "should call on the services of a
medical advisor" to assist in inferring an onset date that is
supported by a "[c]onvincing rationale."  Id.; see also May, 125
F.3d 841 (citing Bailey v. Chater, 68 F.3d 75, 79 (4th Cir.
1995); Spellman, 1 F.3d at 363; Morgan v. Sullivan, 945 F.2d

---

[24] The ALJ sought additional medical evidence from Dartmouth
Hitchcock Medical Center covering the period from 1994 to 1999,
but was informed that Wilson had received no treatment there
during that period.  Tr. at 164-65.

[25] The ALJ did not seek Wilson's permission to contact
individuals who knew him prior to his DLI.  The best source of
such information – Wilson's ex-wife – attended the hearing and
was acknowledged by the ALJ but was never asked to testify.  See
Tr. at 337.

1079, 1082 (9th Cir. 1991)) ("[T]he evidence regarding the date on which claimant's mental impairment became severe is ambiguous.  Therefore, [SSR] 83-20 required the ALJ to consult a medical advisor.").

**B.    Application**

The ALJ did not reference SSR 83-20 in her decision.  Nor did she attempt to determine whether Wilson is currently disabled.  Instead, without consulting a medical advisor, she discounted Wilson's testimony concerning the onset of his disability, refused to credit the uncontradicted medical evidence on the issue, and determined without the assistance of a medical advisor that he was not disabled as of his DLI.  The ALJ based this determination on the fact that the record does not contain any evidence that Wilson had sought contemporaneous treatment for the condition that gave rise to his claimed disability.  This was an error of law that requires remand.

SSR 83-20 specifically contemplates the possibility that an onset date may precede any medical treatment.  See 1983 WL 31249, at *3 ("[I]t may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working.").  If the medical evidence from the period

25

after a claimant's DLI could permit a reasonable inference that the claimant became disabled during the insured period, the absence of pre-DLI medical evidence, standing alone, is not a sufficient basis to deny benefits.  See id.; see also Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 341 (4th Cir. 2012) (when pre-DLI medical records are lacking, post-DLI evidence may be the "most cogent proof" of pre-DLI disability so long as "the record is not so persuasive as to rule out any linkage"); Blea v. Barnhart, 466 F.3d 903, 913-14 (10th Cir. 2006) (same); cf. May, 125 F.3d 841 (citing Arnone v. Bowen, 882 F.2d 34, 39 (2d Cir. 1989)) ("[T]he absence of medical treatment records from the [insured] period . . . [did not] justif[y] the ALJ's finding that the treating source's report was too speculative a basis for establishing a severe impairment."); Moret Rivera v. Sec'y of Health and Human Servs., 19 F.3d 1427 (1st Cir. 1994) (per curiam) (unpublished table decision) ("Medical evidence generated after a claimant's insured status expires may be considered for what light (if any) it sheds on the question whether claimant's impairment(s) reached disabling severity before claimant's insured status expired.").  To be sure, the absence of treatment during the insured period is a factor that the ALJ may consider in making credibility determinations.  See, e.g., Bird, 699 F.3d at 341 n.2; Guranovich v. Astrue, 465 F.

26

App'x 541, 544 (7th Cir. 2012); Grebenick v. Chater, 121 F.3d 1193, 1200 (8th Cir. 1997).  But it cannot obviate the need to call a medical advisor where other medical evidence in the record leaves the onset date ambiguous.  See, e.g., May, 125 F.3d 841.

The evidence in this case clearly leaves that issue ambiguous.  Although there is a gap of five years between Wilson's DLI and his earliest medical records, Drs. Bryant, Finn, Noordsy, and Zayfert - the four mental health specialists who either treated or examined Wilson - all specified that Wilson's mental impairments and concomitant functional limitations existed prior to his DLI.  See Tr. at 171, 253, 259, 262, 295.  The remaining medical sources - Dr. Schneider, a non-examining psychologist; Dr. Eisenberg, an internist; and Mr. Gosselin, a physician assistant specializing in internal medicine - simply stated that they were unable to specify an onset date because Wilson first sought treatment for his mental impairments in 2009.  See Tr. at 172, 184, 329.  That by no means implies that these providers believed that Wilson was not disabled prior to his DLI.  See, e.g., May, 125 F.3d 841; Hall v. Astrue, No. 11-CV-134-JL, 2011 WL 6371875, at *7 (D.N.H. Nov. 29, 2011), rep. & rec. adopted sub nom. Hall v. U.S. Soc. Sec. Admin., Comm'r, 2011 WL 6371369 (D.N.H. Dec. 19, 2011); cf.

27

Biron v. Astrue, No. 09-40084-FDS, 2010 WL 3221950, at *7 (D.
Mass. Aug 13, 2010) (acceptable medical source expressly
concluded that claimant was asymptomatic throughout the insured
period). Further, apart from the inference that the ALJ drew
from the fact that Wilson did not seek medical treatment for his
claimed disability until several years after his DLI, there is
no non-medical evidence in the record that conflicts with the
mental health specialists' retrospective opinions.[26]  See May,
125 F.3d 841.  An ALJ requires such evidence in a case like this
to determine that a claimant's impairments were not severe prior

---

[26] On the contrary, Wilson's testimony – which neither the
medical sources of record nor the ALJ discredited – is
consistent with the existence of disabling mental impairments
prior to his DLI.  See, e.g., Tr. at 343 (chest pain, sweating,
nervousness, hiding from others); Tr. at 345 (fear of being
looked at); Tr. at 347 (stress when around coworkers and
discomfort when within arm's reach of men, including his own
sons); Tr. at 348 (sexual abuse as a child); Tr. at 350, 356
(reliance on wife to do household chores and errands); Tr. at
350 (cutting back work hours, constantly worrying about
returning to work); Tr. at 351 (avoidance of doctors despite
physical ailments); Tr. at 355 (panic attacks); Tr. at 357
(avoiding friends and family); Tr. at 358 (avoiding sons' school
functions); Tr. at 361 (excessive drinking after work); Tr. at
363 (interrupted sleep); Tr. at 364 (racing thoughts).  Given
Wilson's testimony regarding his anxiety around doctors and his
fear of being examined, the dearth of medical records prior to
2005 and the lack of allegations regarding mental impairments
between October 2005 and October 2009 does not approach the
"overwhelmingly compelling non-medical evidence" that would be
necessary to render the record unambiguous.  See May, 125 F.3d
841 (quoting Rivera v. Sullivan, 923 F.2d 964, 969 (2d Cir.
1991)) (internal quotation marks omitted).

to his or her DLI "in the absence of competing medical opinions."  Id.; accord Bird, 699 F.3d at 341.

The Commissioner nevertheless maintains that a remand is not required because the decision whether to call a medical advisor was completely within the discretion of the ALJ.  The Commissioner claims that this is so because SSR 83-20 provides that an ALJ "should call on the services of a medical advisor" in certain circumstances, rather than "shall" or "must" call on those services.  See, e.g., Eichstadt v. Astrue, 534 F.3d 663, 666-67 (7th Cir. 2008) (quoting SSR 83-20, 1983 WL 31249, at *3) (subscribing to this view).  I disagree.  The First Circuit's decision in May makes clear that an ALJ is required to employ the services of a medical advisor when the available evidence regarding disability onset is ambiguous.  See 125 F.3d 841 (citing SSR 83-20, 1983 WL 31249).

In May, as in this case, the ALJ denied a claimant's DIB application at step two of the sequential evaluation process on the ground that the claimant's mental impairments were not severe prior to his DLI.  See id.  The First Circuit remanded for further administrative proceedings, holding that SSR 83-20 "required the ALJ to consult a medical advisor" due to the ambiguous evidence concerning the precise date on which May's

29

impairments became severe.[27]  Id. (emphasis added).  It is

consequently established in this circuit that SSR 83-20's

reference to a medical advisor is mandatory when the evidence of

record regarding disability onset date is ambiguous, at least in

cases in which the ALJ has previously found that the claimant

was disabled on the date he or she applied for benefits.[28]

---

[27] As in this case, the claimant challenged only the ALJ's step
two finding that he did not suffer from a severe mental
impairment prior to his DLI.  See May, 125 F.3d 841.  The court
thus spoke in terms of the date on which the claimant's
impairments became severe, but its holding would be equally
applicable if an ALJ found, based on ambiguous evidence, that a
claimant was not disabled prior to his or her DLI at steps four
or five of the sequential evaluation process.  See 20 C.F.R.
§ 404.1520(a)(4)(iv-v) (discussing a claimant's ability to
perform past relevant work or to make an adjustment to other
work); SSR 83-20, 1983 WL 31249, at *3 ("The onset date should
be set on the date when it is most reasonable to conclude from
the evidence that the impairment was sufficiently severe to
prevent the individual from engaging in SGA (or gainful
activity) for a continuous period of at least 12 months or
result in death.").

[28] The Commissioner relies on the First Circuit's statement in
Rodriguez Pagan that "[u]se of a medical advisor in appropriate
cases is a matter left to the Secretary's discretion; nothing in
the Act or regulations requires it," see 819 F.2d at 5, but that
case preceded May by ten years and did not mention SSR 83-20.
She also cites my decision in Hurd v. Commissioner, Social
Security Administration for the proposition that the Social
Security regulations do not "explicitly direct[] the ALJ to
consult a medical expert," see 2008 DNH 044, 22, but she
neglects to mention my subsequent holding that "the
circumstances of the case required him to obtain expert advice."
See id. (emphasis added) (citing Karlix v. Barnhart, 457 F.3d
742, 747 (8th Cir. 2006); Armstrong v. Comm'r, Soc. Sec. Admin.,
160 F.3d 587, 589 (9th Cir. 1998); SSR 83-20, 1983 WL 31249).

The Commissioner argues that this case is distinguishable from May because the ALJ in that case expressly found that the claimant was disabled on the date he applied for benefits whereas in this case, the ALJ found only that Wilson was not disabled at any time prior to his DLI.  The Commissioner contends that SSR 83-20 is inapplicable in the latter scenario. I reject this argument because I find no support for it either in May or the language of SSR 83-20.

First, the ALJ's finding in May that the claimant was presently disabled was immaterial to the First Circuit's decision.  See 125 F.3d 841.  That finding was mentioned once, in the second sentence of the court's opinion.  There is absolutely no indication that it factored into the court's holding that SSR 83-20 applied in that case and required the ALJ to call a medical advisor.  The only factor specifically mentioned by the court that triggers the medical advisor provisions in SSR 83-20 is ambiguity in the record regarding disability onset.  See id.  As already discussed, that prerequisite was clearly met here.

The scant attention paid to the ALJ's present disability finding in May is not surprising, given that nothing in SSR 83-20 indicates that such a determination - or lack thereof -

31

should matter when the evidence of record is otherwise ambiguous as to the onset of disability.  As I have noted elsewhere,

> [s]ome courts attach significance to the statement in the introduction to SSR 83-20 that "in addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability."  This sentence merely acknowledges the fact that an ALJ must make an onset date determination if he finds that the claimant was disabled when she applied for benefits.  It does not in any way suggest SSR 83-20 is inapplicable in cases where an ALJ denies a claim for DIB by finding that the claimant was not disabled as of her date last insured.

Ryan v. Astrue, 2008 DNH 148, 19 n.7 (citations omitted); see Grebenick, 121 F.3d at 1200 (same).  But see Bird, 699 F.3d at 345 (reaching the opposite conclusion); Eichstadt, 534 F.3d at 667 (same); Key v. Callahan, 109 F.3d 270, 274 (6th Cir. 1997) (same).  This introductory quotation, and the numerous others that the Commissioner relies upon, are simply inapposite.[29]

---

[29] These quotations (with the Commissioner's emphasis and alterations as noted) include: "[t]he onset date of disability is the first day an individual is disabled as defined in the Act and the regulations," SSR 83-20, 1983 WL 31249, at *1; the Ruling's purpose is "[t]o state the policy and describe the relevant evidence to be considered when establishing the onset date of disability under the provisions of titles II and XVI of the Social Security Act (the Act) and implementing regulations," id.; an applicant for DIB benefits cannot be found to be disabled unless "insured status is also met at a time when the evidence establishes the presence of a disabling condition," id.; the claimant's allegations and date of work stoppage are significant "only if it [sic] is consistent with the severity of the condition(s) shown by the medical evidence," id.; and an inference regarding the disability onset date "must have a legitimate medical basis," id. at *3.  According to the

32

The Commissioner further contends that my reading of SSR 83-20 is inconsistent with SSA policy and would impose an undue administrative burden on the agency.  Again, I disagree.  First, I can conceive of no reasonable public policy basis for the SSA to interpret the Social Security Act in a manner that would permit, and possibly encourage, an ALJ to avoid the inconvenience of either calling a medical advisor or making a finding regarding present disability in a case in which the evidence of a claimant's disability onset date is ambiguous.  Cf. Grebenick, 121 F.3d at 1200-01 (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995)) (in the absence of contemporaneous medical evidence, the obligation to call a medical advisor turns on whether the evidence regarding onset is ambiguous, not whether the ALJ could reasonably conclude that the claimant was not disabled before his or her DLI).  Further, an ALJ always has the option to expressly find that a claimant is not disabled as of the date of the hearing, which would

---

Commissioner, all of this language "clearly indicates that if an ALJ finds that a claimant is not disabled, no inquiry into an onset date is required."  Doc. No. 17.  That is true if an ALJ determines that a claimant is not presently disabled, see, e.g., Cohen v. Barnhart, 61 F. App'x 722 (1st Cir. 2003) (per curiam) (unpublished table decision), but I fail to see how any of this language supports the proposition that SSR 83-20 applies only after the ALJ determines that "the claimant has established a disability, and the record is ambiguous as to the onset of that disability."  See Doc. No. 17.

obviate the need to call a medical advisor to determine a (nonexistent) onset date.[30]  See, e.g., Cohen, 61 F. App'x 722; Rossiter v. Astrue, 2011 DNH 115, 10-11.  Consequently, there is no merit to the Commissioner's concern that ALJs might be "require[d] . . . to consult a medical expert regardless of whether there is any evidence of a medically determinable severe impairment or of disability . . . ."  See Doc. No. 17. Unfortunately, the ALJ in this case did not make any findings regarding present disability, and I am limited to reviewing those findings that she did make.  See, e.g., Letellier v. Comm'r of Soc. Sec. Admin., 2014 DNH 052, 22 (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)).

## IV.  CONCLUSION

The ALJ in this case failed to comply with SSR 83-20, which (1) applies regardless of whether the ALJ has made a finding regarding post-DLI disability, see, e.g., Grebenick, 121

---

[30] The Commissioner points me to the SSA's internal guidance manual for the proposition that it serves "no purpose to make findings regarding the claimant's impairments or ability to work after the date last insured," see Social Security Administration, Office of Hearings and Appeals, Litigation Law Manual § I-5-4-40 (Sept. 28, 2005), but the section from which that quotation is taken concerns cases – not at all like the present one - in which "cessation of a prior period of disability is confirmed" and the claimant is seeking a subsequent period of disability.  Id.

F.3d at 1200-01, and (2) requires use of a medical advisor whenever the evidence regarding a claimant's disability onset date is ambiguous.  See, e.g., May, 125 F.3d 841.  Although a DIB claimant bears the burden to prove that he or she was disabled during the insured period, see id., this does not relieve the ALJ of the duty to apply SSR 83-20 as necessary to ensure that the record is fully developed.  See, e.g., Mason v. Apfel, 2 F. Supp. 2d 142, 150 (D. Mass. 1998).[31]

---

[31] Prior decisions of this court have either not followed the reasoning of the remaining cases cited by the Commissioner or distinguished those cases on their facts, and the Commissioner has offered no persuasive reason for me to reach different conclusions.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008), distinguished by Rossiter, 2011 DNH 115; Eichstadt, 534 F.3d at 667, declined to follow by Rossiter, 2011 DNH 115, and Ryan, 2008 DNH 148; Nix v. Barnhart, 160 F. App'x 393, 396-97 (5th Cir. 2005) (per curiam), declined to follow by Rossiter, 2011 DNH 115, and Moriarty v. Astrue, 2008 DNH 158; Scheck v. Barnhart, 357 F.3d 697, 701 (7th Cir. 2004), distinguished by Rossiter, 2011 DNH 115; Asbury v. Comm'r of Soc. Sec., 83 F. App'x 682, 686 n.3 (6th Cir. 2003), distinguished by Rossiter, 2011 DNH 115; Key, 109 F.3d at 274, declined to follow by Rossiter, 2011 DNH 115, Moriarty, 2008 DNH 158, and Ryan, 2008 DNH 148; Sousa v. Astrue, No. 08-218S, 2009 WL 3401196, at *9 (D.R.I. Oct. 21, 2009), distinguished by Rossiter, 2011 DNH 115; Kovacs v. Astrue, No. 08-241, 2009 WL 799407, at *4 (D. Me. Mar. 23, 2009), rep. & rec. adopted, 2009 WL 982235 (D. Me. Apr. 10, 2009), declined to follow by Rossiter, 2011 DNH 115; Lisi v. Apfel, 111 F. Supp. 2d 103, 111 (D.R.I. 2000), declined to follow by Rossiter, 2011 DNH 115.  The Second Circuit's decision in Baladi v. Barnhart is similarly distinguishable.  See 33 F. App'x 562, 564 (2d Cir. 2002) (ALJ expressly found that the claimant was not disabled as of the date of the hearing). Finally, I decline the Commissioner's invitation to adopt the reasoning in Robinson v. Apfel, 229 F.3d 1158 (9th Cir. 2000) (unpublished table decision), a case which has never been cited

Accordingly, I deny the Commissioner's motion to affirm (Doc. No. 12) and grant Wilson's motion to reverse or remand (Doc. No. 9).  Pursuant to sentence four of 42 U.S.C. § 405(g), I remand the case to the Social Security Administration for further proceedings consistent with this decision.[32]

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

May 6, 2014

cc:   Raymond J. Kelly, Esq.
      Robert J. Rabuck, Esq.

---

by any court, for the reasons discussed above.

[32] On remand, the ALJ is free to conclude that Wilson is not entitled to benefits, but only if she first (1) finds on the basis of substantial evidence that he is not presently disabled, or (2) relies on the opinion of a medical advisor to find that Wilson was not disabled prior to his DLI.

36